**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Robert Allen DICKEY, Defendant and Appellant.**

**No. 16819.**

Supreme Court of South Dakota.

Considered on Briefs April 23, 1990.

Decided July 25, 1990.

David D. Wiest, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

Drake A. Titze, Minnehaha County Public Defender, Sioux Falls, for defendant and appellant.

MILLER, Justice.

In this opinion we affirm convictions of first-degree rape and first-degree burglary holding that (1) defendant's admissions to police were voluntary, (2) evidence of other bad acts was admissible, and (3) there was sufficient evidence to support the convictions.

## FACTS

C.S. and five other young women were living in a house off campus while attending Augustana College in Sioux Falls, South Dakota. C.S. testified that on August 18, 1988, she had gone to bed about 1:00 a.m. Sometime after 3:00 a.m., she remembers "feeling that someone was watching [her] or feeling that someone was in [her] bedroom[.]" She sat up and observed an individual standing at the foot of her bed. She could only make out a shadow or silhouette. She screamed and the intruder came over and covered her mouth. She tried to push him away, not sure what was happening. He told her, "shut up or I'll cut your throat, bitch. Shut up or I'll kill you. Close your eyes. You shouldn't leave your doors unlocked, bitch." Additionally, the intruder, told her to quit fighting and cover her face. She began to cry and he placed a pillow over her face.

Anal and vaginal penetration were achieved against C.S.'s will. Subsequent thereto, the intruder masturbated himself on her feet, ejaculating on her legs and the bed sheets. He asked C.S. where the washer and dryer were, to which she replied there weren't any. He then stated that he would have to take the sheets. She testified that he used the sheets to wipe off every item he had touched. He made C.S. take a shower. Before he left, he told her that she was not to contact the police and if she did he would come back and kill her. After he left, C.S. checked the house to see if all the doors were locked. She discovered that the sliding glass door at the rear of the house was open. C.S. woke up one of her roommates and informed her of what had happened and then reported the incident to the police.

During the course of the investigation, S.K., roommate of C.S., reported that approximately one week before the rape a man, who she later identified as Dickey, walked through the hedge into their backyard where she was sunbathing. S.K. testified that he was wearing only tennis shoes and running shorts. Immediately prior to this incident, two other roommates (P.G. and J.S.) observed this individual walk by the front of their house.

Sometime in September, S.K. (while in company with another roommate, D.N.) again observed Dickey at a local dance bar in Sioux Falls. Conducting their own investigation, they visited and danced with Dickey in order to get a better look at him.

Two days later, C.S., S.H., S.K., D.N., and J.S. observed Dickey in the Augustana library (he was not a student). C.S. testified that when he saw her he looked "very surprised. Shocked."

Dickey was later indicted and convicted of first-degree burglary and first-degree rape. He appeals the convictions.

## DECISION

### ISSUE I

WHETHER DICKEY'S ADMISSIONS DURING POLICE INTERROGATION WERE COERCED AND INVOLUNTARY.

■ Dickey primarily focuses on an interrogation conducted by police on September 16, 1988. It is undisputed that Dickey was not "in custody" during the interroga-

tion and that he was not given the *Miranda* warnings. The focus of our discussion addresses whether the admissions and statements of Dickey were the product of police coercion, *i.e.*, were they voluntary? *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Dickey asserts that promises were made to him and used to coerce him during the September 16, 1988, interrogation. Dickey refers us to the following statements during the interrogation by Detective Thompson which he claims are incidents of coercion:

1. "I thought we could handle it this way."
2. "I'm trying to get you help."
3. "This is not a big deal, but we want to get you some help...."
4. "What I'm interested in is getting you counseling, getting you help with this one problem."
5. "... I'm not interested in throwing you in jail, ..."
6. "I can lead and guide you and get you help through counseling or whatever you need or whatever the experts think you need."
7. "... before I can go to somebody and get you some help, I have to know exactly what happened...."
8. "I've gone out on a limb, I've tried to help you with this."
9. "... tell me what happened in the house and get on with life."
10. "... giving you a second chance, sticking my neck out with my superiors to give you a second chance."

■ The State must prove beyond a reasonable doubt that such statements or confessions were freely and voluntarily made. *See State v. Jenner*, 451 N.W.2d 710, 716 (S.D.1990) (citing *State v. Faehnrich*, 359 N.W.2d 895, 898 (S.D.1984); *State v. Janis*, 356 N.W.2d 916, 918 (S.D.1984)). At the suppression hearing, the trial court found that the statements made by Dickey were voluntary. That finding is binding on us and will not be overturned unless we determine it to be clearly erroneous. *Jenner, supra; Faehnrich, supra.*

■ The test for determining voluntariness of incriminating statements or confessions requires a review of the totality of the circumstances. *Jenner, supra; State v. Hartley*, 326 N.W.2d 226 (S.D.1982); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (confession is voluntary if it is made freely and unconstrainedly).

As the United States Supreme Court has noted, "[t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases ... where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused." *Haynes v. Washington*, 373 U.S. 503, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513, 521 (1963); *Miller v. Fenton*, 796 F.2d 598 (3rd Cir.1986).

As stated earlier, to determine the voluntariness of a confession, the court must consider the effect the totality of the circumstances had upon the will of the defendant. *Miller, supra.* The question in each case is whether the defendant's will was overborne. *Id.* The factors to be considered include: The youth of the accused; his lack of education or his low intelligence; lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and, the use of physical punishment such as the deprivation of food or sleep. *Hartley, supra; Schneckloth, supra.*

■ It is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect. *Miller, supra* at 605. For example, an interrogator may play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state. *Rachlin v. United States*, 723 F.2d 1373 (8th Cir.1983); *Miller, supra.* These ploys may play a part in the suspect's decision to confess, but, so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.

*Miller, supra; Hartley, supra.* Therefore, the question we must answer is not whether the interrogators' statements were the cause of Dickey's confession, but whether those statements were so manipulative or coercive that they deprived Dickey of his ability to make an unconstrained, autonomous decision to confess. *Id.*

We fail to see how the remarks of the detective could be construed to be coercive. His obvious intent was to seek professional help for Dickey assuming it was needed. In fact, Dickey did receive such help at a later date. Additional evidence of voluntariness is found in the testimony of Detective Thompson. He testified that at one point during the interrogation he became frustrated with the interview and told Dickey it was over. He indicates that Dickey said, "no, no" and went over to the door and blocked Detective Thompson's exit, stating that he did not want the interview to end. Dickey admitted this on cross-examination.

Finally, we find most interesting and compelling the following colloquy which took place between Dickey and the prosecutor during cross-examination at trial.

Q Now, when you spoke to Detective Thompson on September 16th, you did so voluntarily, didn't you?

A First meeting?

Q Second meeting, I guess is what I'm talking about.

A Yes.

Q When had you first—you talked to Agent DeVaney, then you talked to Detective Thompson?

A Okay. Yeah. Second time.

Q That was all voluntary on your part?

A Yes, sir.

Q Nobody forced you to do it?

A No.

Obviously, Dickey did not feel coerced!

The trial court found Dickey to be reasonably intelligent, to have the substantial capacity to resist pressure, that the conduct of the police was not coercive but meant to suggest that telling the truth would be in his best interest, and that in addition under the totality of the circumstances his will had not been overcome and his statements during the September 16 interview were voluntary. "In reviewing the trial court's findings on voluntariness, we consider the evidence in the light most favorable to the finding." *Jenner, supra* at 716. We hold that this finding by the trial court is not clearly erroneous. *Jenner, supra.* The proper factors were considered and a determination made in accordance therewith. The trial court did not err in holding that the statements were voluntary and admissible.

## ISSUE II

**WHETHER EVIDENCE OF PRIOR ACTS SHOULD HAVE BEEN EXCLUDED FROM EVIDENCE AS IRRELEVANT AND PREJUDICIAL.**

■ Dickey had moved to suppress incidents of prior window peeking at C.S.'s and other residences. The trial court ruled that testimony concerning these acts, which occurred at the victim's residence, were admissible to prove motive, intent and identity; however, other incidents of window peeking in the Sioux Falls area were not. Evidence and testimony regarding the incidents at C.S.'s residence were thus admitted at trial.

During interrogation, Dickey admitted to having committed several acts of window peeking at C.S.'s residence. He testified that on one occasion he masturbated while peering through a window. Additionally, he admitted to walking through a hedge into the backyard of the residence and observing S.K. sunbathing and visiting with her until she went into the house through the patio door.

Dickey asserts that it was an abuse of discretion for the trial court to permit testimony of the window peeking activities. He argues that the prejudicial effect outweighs its probative value. Additionally, he contends that these acts were not shown to be relevant.

State contends that SDCL 19-12-5 [1] permits introduction of these acts because they evidence preparation, plan, knowledge, and identity.

The test for determining whether evidence of other crimes or wrongs was properly admitted against a defendant involves a two-step inquiry. It first must be determined whether the proffered evidence is relevant to proving one of the stated exceptions of SDCL 19-12-5. *State v. Bradley*, 431 N.W.2d 317 (S.D. 1988). *See also State v. Titus*, 426 N.W.2d 578 (S.D.1988), and [*State v. Champagne*, 422 N.W.2d 840 (S.D. 1988)]. If the evidence is found to be relevant, it next must be determined whether its prejudicial effect substantially outweighs its probative value. *Bradley, supra; Titus, supra; Champagne, supra;* see also SDCL 19-12-3. Evidence is relevant and has probative value if it contains any fact which tends to connect an accused with the commission of a crime. *See State v. Reutter*, 374 N.W.2d 617 (S.D.1985). However, if the court determines that the evidence is relevant, but that its submission will unfairly prejudice the defendant's case, such evidence cannot be admitted. *Bradley, supra; Titus, supra; Reutter, supra.* Under *State v. Holland*, 346 N.W.2d 302 (S.D.1984), this balancing process is within the sound discretion of the trial court. Further, this balancing process must be conducted on the record. *See State v. Eagle Hawk*, 411 N.W.2d 120 (S.D.1987).

*State v. Klein*, 444 N.W.2d 16, 18-19 (S.D. 1989). *See also, State v. Goodroad*, 442 N.W.2d 246 (S.D.1989); *State v. Rufener*, 392 N.W.2d 424 (S.D.1986).

Our review of the evidence leads us to conclude that the trial court did not abuse its discretion by admitting Dickey's acts of window peeking at C.S.'s residence. In addition to showing his identity, we believe that these voyeuristic acts were relevant to show preparation, knowledge, and a plan to enter the house. They show that Dickey was familiar with the location of the house, the layout of its interior, that it was occupied exclusively by women, and that it had a patio door rear entrance.

Lastly, we do not believe the trial court erred in determining that the probative value of the evidence, as admitted, was not outweighed by its prejudicial effect. The trial court performed the appropriate balancing and did not abuse its discretion in admitting such evidence. *Klein, supra; Goodroad, supra; Champagne, supra; State v. Swallow*, 405 N.W.2d 29 (S.D. 1987).

### ISSUE III

### WHETHER SUFFICIENT EVIDENCE EXISTED IN SUPPORT OF THE CONVICTIONS.[2]

In determining sufficiency of the evidence on appeal, the question presented is, "whether there is evidence in the record, which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt.... In making this determination, the Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the

---

1. SDCL 19-12-5 provides:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

2. Dickey was convicted of first-degree burglary in violation of SDCL 22-32-1(3), which provides:
   Any person who enters or remains in an occupied structure, with intent to commit any crime therein, is guilty of first degree burglary when:

   . . . .
   (3) The offense is committed in the nighttime. Dickey was also convicted of first-degree rape, a violation of SDCL 22-22-1(1), which provides:
   Rape is an act of sexual penetration accomplished with any person other than the actor's spouse under any one or more of the following circumstances:
   (1) Through the use of force, coercion or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution[.]

verdict." *State v. Miller*, 429 N.W.2d 26, 38 (S.D.1988) (citations omitted). *See also Jenner, supra.*

■ The testimony indicated that Dickey had been identified on four separate occasions by C.S. and her roommates, excluding the night of the rape. Twice he was observed at or near their residence. In addition, Dickey admitted that he had been there on other occasions window peeking. It is also important to note that although C.S. testified that she only saw a shadow or silhouette the night of the rape, she was able to identify and suggest material changes in the composite sketch created by S.K. and the police artist (specifically, she noticed that glasses and a mustache were missing). These alterations in the sketch were significant to Dickey's identification. Finally and emphatically, we point out that during the interrogation with Detective Thompson, Dickey admitted that on the night of the rape he entered the victim's residence and masturbated on her bed.

The evidence and testimony presented are clearly sufficient to support the jury's determination of guilt.

Affirmed.

WUEST, C.J., and MORGAN, J., concur.

HENDERSON and SABERS, JJ., concur specially.

HENDERSON, Justice (specially concurring).

Issues 2 and 3 are not theoretically troublesome to me. However, the ramifications pertaining to Issue 1 concerns me to such an extent that I feel compelled to write.

Was the accused's will overborne? *State v. Hartley*, 326 N.W.2d 226, 230 (S.D.1982). This—we must examine.

I do not wish to place my imprimatur on *all* of the questions and statements asked by Detective Thompson. I honestly believe, from reading his questions, that he was not simply interested in obtaining psychological help for Dickey. He was also very interested in getting to the truth (which is his job as a detective) by artful and psychological questioning. This case does not trouble me, in its ultimate result, because the evidence is absolutely overwhelming that Dickey committed savage acts upon this innocent young lady who attended Augustana College in Eastern South Dakota. My basic mental overview is to ask if, under the totality of the circumstances, his damaging admissions were voluntary? *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

In a nutshell, the detective made some promises which are rather far reaching. He made promises of psychological help, no prosecution, and indicated that Dickey's potential chances to be a law enforcement officer would be decreased if he did not cooperate. At one time, the officer said "... we're not looking to ... get you in big trouble. This is not a big deal...." However, a prosecution for first degree burglary and first degree rape is a big deal. It was a big enough deal to have a sentence imposed upon Dickey for a twenty-five (25) year imprisonment on the first degree rape conviction and a ten (10) year prison term on the first degree burglary conviction. When one reads over these facts, one is totally appalled at the heinous crime perpetrated by Dickey upon this young lady. The gravamen of the crime of rape is the outrage to the individual. This young lady was shamed, embarrassed and humiliated in an outrageous manner. It is difficult for me, to say the least, to approve of the law enforcement conduct; it pales when it is compared to the type of acts that Dickey perpetrated upon this young college lady which is beyond civilized comprehension. Dickey's conduct was base, depraved and vile.

I vote hereby to affirm this conviction but with a singular warning to the Sioux Falls Detective Bureau that there is a limit to which it can proceed, in order to obtain incriminating statements. I truly hope that this affirmance does not spawn further similar practices. We are straining the outer limits of liberality in tacitly ap-

proving Detective Thompson's questioning technique.

The saving fact to escape a reversal for the State of South Dakota lie in this: Dickey truly expressed, under oath, that he had *voluntarily* made his damaging admissions to Detective Thompson.

I would add a dash of facts in order to accomplish full review of the evidence in deciding if Dickey was coerced or his will overborne. *United States v. Wilson*, 787 F.2d 375, 380, 381 (8th Cir.1986). Dickey voluntarily came to the police station on September 14, 1988. He voluntarily agreed to return to the police station at a later time, namely September 16, 1988. Oddly, when the police interview ended, the defendant wanted it to continue. Dickey went so far as to tell Detective Thompson to sit down so the interview would and could continue.

Summarizing, I do not approve of the far reaching approach of Detective Thompson; however, it is extremely difficult to opine that Dickey was coerced or his will overborne when he says that his statements were voluntary and it appears that he wanted the interview to go on. Detective Thompson was going to terminate the interview because it was going nowhere. Dickey, at that point, blocked the doorway. As I have mentioned above, he then told the detective to sit down. Thus, I cannot express that the trial court erred. We must consider the evidence in the light most favorable to the trial court's finding. And we must consider the entire record in looking at the circumstances to determine if the defendant was coerced or his will overcome. *United States v. Wilson*, 787 F.2d 375, 380–81 (8th Cir.1986). The trial judge had the live case before him; I have only the cold record.

SABERS, Justice (concurring specially).

I write specially to point out that almost all of the time, trouble, and effort expended in this appeal could have been avoided if law enforcement officers followed the simple admonition of Justice Morgan in *Satter v. Solem*, 434 N.W.2d 725, 727 (S.D.1989), (*Satter II*):

After all, it requires no great effort to take out the *Miranda* card, read the subject his rights, and ask the simple questions: Do you understand your rights and do you waive them?

I also join Justice Henderson's writing concerning Detective Thompson's conduct, which conduct consisted of lies and white lies and cannot be condoned. *Cf. People v. Shaw*, 180 Ill.App.3d 1091, 129 Ill.Dec. 799, 536 N.E.2d 849 (1989) (suppression of defendant's statement was warranted because it was improperly induced by the interrogating officer's promise that defendant could get help in the form of psychiatric counseling if he were found guilty). Such conduct is totally unbecoming of a law enforcement officer of this state, whose sworn duty is to uphold and enforce the law.